## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **TOYA STRAND,** *individually and as* | * | |
| *legal guardian of JT, a minor* | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. **PJM 14-3521** |
| | * | |
| **UNITED STATES OF AMERICA,** | * | |
| *Department of the Army* | * | |
| | * | |
| | * | |
| Defendant. | * | |

## <u>MEMORANDUM OPINION</u>

Toya Strand, individually and on behalf of her son JT (a minor), has sued the United States (the Government) under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, *et. seq.*, in connection with injuries her son sustained while attending a summer camp run by the United States Army at Fort Meade, Maryland. In her Complaint, Strand alleges that the Government, its camp counselors, and camp directors owed duties to her and JT, which they breached due to negligence. She also asserts an agency/vicarious liability claim against the Government as the employer of the counselors, camp directors, and other individuals who purportedly breached those duties. She seeks judgment against the Government in the amount of $750,000.

The Government argues that the Court lacks jurisdiction over the dispute because the discretionary function exception to the FTCA applies.[1]

---

[1] As elaborated *infra*, the discretionary function exception provides that the Government is not liable for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

This is not the first time in this case that the Government has raised the discretionary function exception. The Court previously denied without prejudice the Government's Motion to Dismiss for Lack of Jurisdiction (ECF No. 14), which asserted that the discretionary function exception barred the suit. The Court then allowed discovery to go forward, following which, the Government has again asked for dismissal of the suit based on the discretionary function exception, this time in the form of a Motion to Dismiss for Lack of Jurisdiction or, Alternatively, for Summary Judgment (ECF No. 46).

On November 15, 2016, the Court held a motions hearing on the Government's Motion. At the hearing, the Court, *sua sponte*, inquired as to the potential application of the voluntary undertaking theory of liability to the case.[2] Because the parties had not briefed this issue, the Court granted the Government leave to submit supplemental briefing and Strand an opportunity to respond. The parties did so, and the Court has now reviewed those filings. For the following reasons, the Court will **GRANT** the Government's Motion to Dismiss (ECF No. 46) and therefore, need not address its alternative Motion for Summary Judgment (ECF No. 46). Consistent with this, Strand's Complaint (ECF No. 1) will be **DISMISSED WITH PREJUDICE**.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. The Camp

During the summer of 2011, Strand's minor son, JT, who was then 12-years-old, attended a summer camp program (the Camp) run by the U.S. Army Child, Youth and School Services at Fort George G. Meade (Fort Meade) at Fort Meade, Maryland.  Compl. ¶ 5, ECF No. 1. The

---

[2] As elaborated *infra*, the voluntary undertaking theory holds that one who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, may be subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking. *See* Restatement Second of Torts § 323 (1965).

Camp was operated by the Army's Youth Program during the summer months to care for children of military and Department of Defense personnel. *See* Def's. Mot. to Dismiss or Summary Judgment, Exhibit A, ECF No. 46-3 (Youth Program Handbook), 3. The campers rotated through various activities at different facilities at the Youth Center, including a computer lab, dance studio, and music room. *See* Def's. Mot. to Dismiss, Exhibit B, ECF No. 14-4 (Decl. of F. Jamison), ¶ 11. The campers also took on-post field trips to the Camp's swimming pool and bowling alley as well as off-post field trips to the zoo and a movie theater. *Id.* ¶ 12. When taking a field trip to the on-post pool, campers, accompanied by counselors, were transported on a school bus. *Id.* ¶ 13.

### B. The Incident

The incident at issue occurred during one of these on-post field trips to the pool. On August 9, 2011, JT and between 19 and 34 other campers were transported from the Youth Center to the Camp's pool. *See* Def's. Mot. to Dismiss or Summary Judgment, Exhibit H, ECF No. 46-10 (Attendance Form); Def's. Mot. to Dismiss or Summary Judgment, Exhibit F, ECF No. 46-8 (Dep. of JT), 10; Def's. Mot. to Dismiss or Summary Judgment, Exhibit G, ECF No. 46-8 (Dep. of K. Wade), 30-31. They were accompanied by three counselors—Kimberly Wade, Mike King, and Terrance Trotman—as well as two to four lifeguards. *See* Dep. of K. Wade, 31-33; Def's. Mot. to Dismiss or Summary Judgment, Exhibit O, ECF No. 46-17 (Dep. of M. Wise), 15-16; Def's. Mot. to Dismiss or Summary Judgment, Exhibit B, ECF No. 46-4 (Dep. of F. Jamison), 11.

After swimming, JT went into the locker room to change clothes. *See* Def's. Mot. to Dismiss or Summary Judgment, Exhibit E, ECF No. 46-7 (Dep. of JB), 11. There were approximately eight or nine children in the boys' locker room, including JB who, at the time,

was 14 years old. *See id.* at 11, 20-21; Plf's. Resp, Exhibit I, ECF No. 52-8 (Dep. of J. Beasley), 6. While in the locker room, JB and JT exchanged words, seemingly disagreeing about whether JT had insulted JB's mother. Dep. of JT, 12-14. After exchanging words, JB struck JT one time in the face. *Id.* at 16-17.

There were no counselors inside the locker room when the incident occurred. *See* Plf's. Resp., Exhibit M, ECF No. 52-11, (Dep. of K. Wade (2)), 48-49. Kimberly Wade, the counselor closest to the locker room at the time, was standing outside the boys' locker room in order to simultaneously monitor both the boys' and girls' locker rooms. *Id. See also* Mot. to Dismiss or Summary Judgment, Exhibit K, ECF No. 52-10 (K. Wade Incident Report). In the minutes preceding the incident, Wade entered the girls' locker room in an attempt to get the girls to finish changing more quickly. *Id.* After leaving the girls' locker room, Wade heard the sound of "body movements" coming from the boys' locker room. *Id.* at 51. She yelled into the boys' locker room in an attempt to get the boys to hurry up. *Id.* at 52. While she could tell that there was an argument in progress, she could not hear what words were being said. *Id.* at 52-53. She then walked to the doorway of the boys' locker room, intending to go inside in order to see what was going on and stop whatever conflict was taking place. *Id.* at 53-54; K. Wade Incident Report. However, upon hearing a shower running, Wade decided that she should not enter the boys' locker room out of fear that a boy might be indecent. Dep. of K. Wade, 54; K. Wade Incident Report. At that point, Wade began to walk to the entrance of the pool to ask a male counselor to enter the boys' locker room and check on things. Dep. of K. Wade, 55; K. Wade Incident Report. However, before Wade could reach a male counselor, she heard several high pitched voices as well as the sound of crying. Dep. of K. Wade, 57; K. Wade Incident Report. A number of boys then ran out of the locker room saying that there was a fight. Dep. of K. Wade, 57-58; K. Wade

Incident Report. Shortly after, JT emerged from the locker room crying with blood dripping from his mouth. Dep. of K. Wade, 58; K. Wade Incident Report. J.B., as indicated, had allegedly struck him. *Id*.

### C. Camp Governance

The Camp's operations were governed by Army Regulation 608-10 and Department of Defense Instructions 6060.2 and 6060.4 as well as a series of handbooks, guides, and standard operating procedures. Dep. of F. Jamison, 17.[3] The Youth Program Handbook stated that the Youth Programs "are designed to enhance soldier readiness by reducing the conflict between mission and parental responsibilities, to facilitate Family well-being, and to reinforce Army values." Youth Program Handbook, 2.  Youth Programs utilize a framework focusing on four areas of development: (1) sports, fitness, and health; (2) life skills, citizenship, and leadership; (3) arts, recreation, and leisure; and (4) academic support, mentoring, and intervention. *Id.* at 4. The Youth Program Handbook provided instruction for child supervision, staffing, and employee training. It states,

> Accountability of youth must be maintained at all times. No youth are left unsupervised at any time, indoors or outdoors, asleep or awake (e.g., an overnight field trip). Supervision of youth must be defined based on the participants' ages and stages, developmentally-appropriate practices, parental permission, and situational risk. A system of accountability must be ensured. Supervision of middle school and teen youth does not necessarily require that direct Line-O-Sight Supervision (LOSS) is maintained at all times (e.g., see

---

[3] The handbooks and other relevant materials included:
- Army Youth Program Director's Handbook (Youth Program Handbook)
- U.S. Army Child, Youth & School Services Parent Handbook
- Policy Memorandum #43, Parental Responsibilities and Supervision of Children and Youth
- Standard Operating Procedure – Guidance, Discipline, Touching, and Accountability of Children and Youth
- Standard Operating Procedure, Child, Youth and School Services – Field Trips
- Standard Operating Procedure, Child, Youth and School Services – Supervision of Children
- Anne Arundel County Public Schools Code of Student Conduct
- U.S. Army Child, Youth and School Services, Staffing Business Rules
- Child and Youth Services Organizational Structure

field trips). . . . YP management personnel will ensure extra vigilance in supervision of youth during times of greater confusion (e.g., during dances, field trips, special events, or during personnel turnover).

*Id.* at 15.[4] With regard to child safety, the Youth Program Handbook stated that the Youth Program Director should "encourage participants and staff to be independent decision-makers promoting their own safety." *Id.* at 71.

The Youth Program Handbook required a general staffing ratio of 1 supervisor to 15 children, and in the case of an on-site field trip to the pool, the ratio was reduced to 1:8 when lifeguards were present. *Id.* at 18. The Youth Program Handbook stated that "[s]upervision of youth during field trips does not always require direct [Line-O-Sight Supervision]." *Id.* at 16. There was no general requirement that staff be present in a bathroom or locker room. There was, however, one circumstance in which the Youth Program Handbook mandated staff presence in a locker room—if there had been an allegation of institutional child sexual abuse.[5] *Id.* at 15. In her deposition, Wade stated that there was a policy that female counselors could not go into the boys' locker room. Depo. Of K. Wade, 55. She did, however, indicate that there was an exception to that policy if someone was in danger and it was unsafe not to enter. *Id.*

---

[4] Strand cites various parts of Army Regulation 608-10 to the effect that, "Visual supervision of all children must be maintained at all times. No child will be left unattended at any time indoors or outdoors, asleep or awake. . . . Provision for adult supervision of child toilets, separate from adult/child ratios within the child activity rooms, is required when child toilets are not within the child activity room. . . . At least two caregivers must be present with each group of children at all times. . . . Children must be supervised through close observation measures to ensure oversight by more than one adult. . . . All indoor and outdoor child activity spaces must be visually and physically accessible to multiple adults for supervision purposes." *See* Response in Opp., 4. As clarified by the Government, Army Regulation 608-10 addresses oversight of children at Child Development Centers, but it has also been adopted by the Youth Programs for certain issues. *See Mot. to Dismiss and Summary Judgment*, 5 (citing Decl. of F. Jamison ¶ 8). Accordingly, the requirements regarding "child toilets" only apply to Child Development Centers, which provide child care to younger children and infants. *Id.*

[5] There was no such pending allegation at the time of the incident. *See* Def's. Mot. to Dismiss or Summary Judgment, 5.

**D. Procedural History**

On November 10, 2014, Strand filed suit against the Government pursuant to the FTCA, alleging negligence and vicarious liability. Compl. The Government filed a Motion to Dismiss, arguing that the Court lacked subject matter jurisdiction pursuant to the discretionary function exception. ECF No. 14. Following a hearing on June 15, 2015, the Court denied the motion without prejudice.  ECF No. 23. The Government then answered (ECF No. 26), and the parties engaged in extensive discovery, which included a number of depositions of key actors in the incident such as JB, JT, Wade, and JB's mother. The Government then filed the pending Motion to Dismiss or, Alternatively, for Summary Judgment (ECF No. 46), once again seeking dismissal pursuant to the discretionary function exception. Strand responded (ECF No. 52), and the Government replied (ECF No. 54). The Court held a hearing on November 15, 2016. At the conclusion of the hearing, the Court raised the potential application of the voluntary undertaking doctrine and provided the parties with an opportunity to submit supplemental briefing on the issue. The parties filed supplemental briefs (ECF Nos. 57, 62), and the Government has since submitted correspondence regarding *United States v. Wood*, 845 F.3d 123, (4th Cir. 2017), a recent Fourth Circuit opinion addressing the discretionary function exception (ECF No. 60).

**II.  SPOLIATION**

As an initial matter, the Court addresses Strand's Motion for Spoliation Sanctions.[6] Put simply, Strand asserts that the Government has admittedly lost some of the most relevant evidence in the case, i.e. (1) the "trip information form" (2) the Camp file related to the field trip to the pool on August 8, 2011, and (3) the Camp's "weekly file" containing relevant information such as the sign-in sheet that showed precisely which campers and counselors went to the pool

---

[6] Although not styled as a Motion for Spoliation Sanctions, the Court interprets Strand's allegations of spoliation in her Response in Opposition (ECF No. 52) as such.

on that day. Strand contends that as a result of the Government's failure to preserve this evidence, the parties have not been able to identify with certainty which, if any, male staff members were present on the field trip, the precise number of campers on the field trip, and the identity of the campers on the field trip. She seeks to have an adverse inference drawn against the Government in the form of a presumption that the lost evidence would have been helpful to her and harmful to the Government.

Strand's Motion for Spoliation Sanctions is **DENIED**. She has not shown that the Government was obligated to preserve this evidence or that it acted with culpable intention. *See Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 509 (D. Md. 2009) ("A party seeking sanctions for spoliation must prove . . . the party having control over the evidence had an obligation to preserve it when it was destroyed or altered [and] the destruction or loss was accompanied by a 'culpable state of mind.'") (*quoting Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 219 F.R.D. 93, 101 (D. Md. 2003)). Further, Strand has failed to prove the relevance of the documents. *Id.* It is by no means clear that the allegedly "despoiled" documents would have provided information not otherwise available from the attendance sheet, which was produced, or other discovery revealing the identity of the counselors on the trip. In any event, as the Court now explains, Strand's case is infirm, whatever the missing documents might show.

## II. MOTION TO DISMISS

Strand alleges that the Government is liable pursuant to the FTCA for the injuries sustained by JT based on theories of negligence and vicarious liability. The Government argues that the actions taken and decisions made by the Camp, its directors, and its counselors were discretionary, and therefore not actionable under the FTCA. If the discretionary function exception to the FTCA applies, the Court without question lacks subject matter jurisdiction over

Strand's claims. Strand counters, arguing that the discretionary function exception cannot apply because: (1) the Government violated its own policy with respect to the supervision of children (2) the failure to adequately supervise the boys' locker room was not based on considerations of public policy; and (3) the voluntary undertaking doctrine defeats the discretionary function exception.

### A. Standard of Review

A party may move for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) where the court lacks subject matter jurisdiction over the claims alleged in the complaint.  Fed. R. Civ. P. 12(b)(1).   Federal courts are courts of limited subject matter jurisdiction: they "possess only the jurisdiction authorized them by the United States Constitution and by federal statute."  *See United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citing *Bowles v. Russell*, 551 U.S. 205, 127 S. Ct. 2360, 2365, 168 L.Ed.2d 96 (2007)).  As the party asserting jurisdiction, the plaintiff bears the burden of proving that the district court has subject matter jurisdiction.  *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). When a governmental entity is sued and Congress has not waived sovereign immunity as to the claim, sovereign immunity deprives the court of jurisdiction to hear the case. *See Global Mail Ltd. v. United States Postal Serv.*, 142 F.3d 208, 210 (4th Cir.1998). When a district court determines that it lacks subject matter jurisdiction over an action, it must dismiss the action.  *Vuyyuru*, 555 F.3d at 347 (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506-07, 126 S. Ct. 1235, 163 L.Ed.2d 1097 (2006)). In considering whether to dismiss for lack of jurisdiction, the court may consider "evidence outside of the pleadings without converting the proceeding into one for summary judgment." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (quoting *Richmond, Fredericksburg & Potomac R.R. Co.*, 945 F.2d at 768); *see*

*also Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) ("[T]he court may consider the evidence beyond the scope of the pleadings to resolve factual disputes concerning [subject matter] jurisdiction.").

### B. The FTCA and Discretionary Function Exception

"[N]o action lies against the United States unless the legislature has authorized it." *Dalehite v. United States*, 346 U.S. 15, 30 (1953). However, by virtue of the FTCA, Congress created a limited waiver of sovereign immunity for claims brought against the United States based on the negligence or wrongful acts or omissions of its employees committed within the scope of employment. 28 U.S.C. §§ 1346(b)(1), 2671-2680. In those circumstances, the Government will accept liability in the same manner and to the same extent as a private individual would have under like circumstances. *Id. See Wood v. United States*, 845 F.3d 123, *7 (4th Cir. 2017). The waiver is limited and circumscribed by numerous exceptions. *See Wood*, 845 F.3d at *7.

Pursuant to the discretionary function exception to the FTCA, the Government is not liable for any claim "based upon the exercise or performance or the failure to exercise or perform *a discretionary function or duty* on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a) (emphasis supplied). "Plaintiffs bear the burden of proving that the discretionary function exemption does not apply." *Indemnity Ins. Co. of North America v. U.S.*, 569 F.3d 175, 180 (4th Cir. 2009). Furthermore, the FTCA is strictly construed and any ambiguities are resolved in favor of the United States. *See U.S. v. Nordic Village, Inc.*, 503 U.S. 30, 33-34 (1992).

Determining whether the discretionary function exception applies involves two steps. First, the Court must determine whether the challenged conduct "involves an element of

judgment or choice." *Suter v. U.S.*, 441 F.3d 306, 310 (4th Cir. 2006).  No discretion has been found when "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Indemnity Ins. Co.*, 569 F.3d at 180. Second, the Court must determine "whether [the] judgment [in question] is of the kind that the discretionary function exception was designed to shield, i.e., whether the challenged action is 'based on considerations of public policy.'" *Suter*, 441 F.3d at 311. "This second step of the analysis is designed to prohibit courts from 'second guessing' decisions 'grounded in social, economic, and political policy through the medium of an action in tort.'" *Wood*, 845 F.3d at *10 (*quoting United States v. Gaubert*, 499 U.S. 315, 323 (1991)). Furthermore, "when established government policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324. "Determining whether the discretionary function exception applies is not a fact-intensive exercise, as the court will only 'look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy.'" *Chang-Williams v. Dep't of the Navy*, 766 F. Supp. 2d 604, 617 (D. Md. 2011) (quoting *Baum v. United States,* 986 F.2d 716, 721 (4th Cir.1993)).

In analyzing whether the discretionary function exception applies, courts need not consider whether the Government employee in fact had subjective knowledge of her discretion or indeed that she subjectively intended to exercise it. *Id.* at 325. Rather, the analysis focuses objectively on "the nature of the actions taken and on whether they are susceptible to policy analysis." *Id*.

Similarly, application of the discretionary function exception does not depend on the seniority of the government employee—it applies equally to high-level agency officials setting policy as well as low-level employees implementing policy. *See Wood*, 845 F.3d at *11-12. The analysis focuses solely on whether the Government's conduct involved choice implicating policy *Id.*

Strand seeks to hold the Government liable for negligence. In order to prove negligence, a plaintiff must show "a duty owed to him (or to a class of which he is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages." *Jacques v. First Nat'l Bank*, 307 Md. 527, 531 (1986). According to Strand, there are two bases that establish the duties the Government owed to her and JT. One set of duties arises from the need for the Government, as a facilitator of a summer camp, to adequately supervise its campers. This basis of liability involves the failure to station a counselor inside the boys' locker room and the decision to place a female counselor outside of the boys' locker room, who might be loath to enter the locker room. The other set of duties stems from Wade's decision to voluntarily undertake the protection of JT. Since the application of the discretionary function exception varies based on these two bases, they will be considered separately.

## 1. The Duty to Supervise Campers

Strand asserts that the Government, camp counselors, and camp directors owed duties to her and JT to properly supervise the campers, to abide by the standard of care for camps generally as well as during pool field trips, to follow guidelines for running a camp, to train and supervise counselors, and to ensure that campers were not exposed to dangerous situations. She claims that the Government breached these duties by failing to provide adequate supervision of

the campers in the locker room.[7] The Government argues that the counselors' decisions regarding supervision were discretionary. Given the Government's contention that the discretionary function bars her suit, Strand has the burden of demonstrating that the exception does not apply.

Applying the two-step framework, the Court considers first whether the Government's conduct involved an element of choice. In other words, the Court must determine whether any federal statute, regulation, or policy prescribed necessary conduct in this circumstance. *See Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

Here, the rules and documents governing the administration of the Camp did not require any specific, mandatory supervisory course of conduct. Instead, they demanded that the counselors use discretion. To be sure, the Youth Program Handbook stated, "[a]ccountability of youth must be maintained at all times," but clarified that "[s]upervision of middle school and teen youth does not necessarily require that direct Line-O-Sight Supervision is maintained at all times." Furthermore, it said, "Supervision of youth must be defined based on participants' ages and stages, developmentally appropriate practices, parental permission, and situational risk." As

---

[7] Initially, Strand also asserted that the Government breached its duties by failing to hire enough personnel to adequately supervise the pool field trip and failing to properly train its counselors. While it seems that Strand may have abandoned both of these theories, even if she has not, they are barred by the discretionary function exception. Staffing decisions are indisputably discretionary functions. *See S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. at 820 (holding that FAA implementation of safety regulations was discretionary because, in part, "such decisions require[d] the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought against such practical considerations as staffing and funding"). With regard to the first step of discretionary function exception analysis, in this case, not only was there no mandatory requirement that the Camp have a determined number of counselors to staff the pool locker room; the Camp's provision of three counselors and two to four lifeguards clearly satisfied the 1:8 adult-to-youth ratio required under the Youth Program Handbook. As to the second step of the analysis, staffing decisions have policy implications related to child safety, health, and privacy, as well as budgetary implications. *See id.* Training decisions are similarly discretionary. *See LeRose v. U.S.*, 285 Fed. Appx. 93, 97 (4th Cir. 2008) (concluding that a federal agency's "decisions regarding the hiring, supervision, and retention . . . are precisely the type of decisions that are protected under the discretionary function exemption"). The Camp was not required by regulation or guideline to train its counselors in locker room safety, and the decision not to train them was unquestionably based on considerations of budget, safety, health, and development.

such, while some of the applicable regulations spoke to the need to supervise the campers, they also allowed for the exercise of some amount of discretion and choice and acknowledged that individual circumstances could impact these decisions.

The Youth Program Handbook required a staff to camper ratio of 1:8, but did not detail particular rules pertaining to the gender of those staff members, nor indicate where those staff members needed to be while supervising the campers, nor how close they needed to be to the children in the locker rooms. More particularly, no statute, regulation, or policy mandated that counselors, much less male counselors, be present in the locker room while the boys were changing clothes.[8] Similarly, the regulations did not require constant accompaniment on field trips or outings.

In the final analysis, the regulations governing supervision of campers on a field trip to a pool were at best vague, a strong suggestion that the discretionary function exception should apply. *C.f. Lafayette Federal Credit Union v. United States*, 76 F.Supp. 2d 645, 653 (D. Md. 1999). There remained a range of choices that the Camp could make in exercising reasonable care under the circumstances. *See Calderon v. U.S.*, 123 F.3d 947, 950 (7th Cir. 1997) ("While it is true that this statute sets forth a mandatory duty of care, it does not, however, direct the manner by which the BOP must fill their duty to protect inmates."). There was no mandate contained in any statute, regulation, or policy regarding the supervision of campers at the camp or in the locker room. Ineluctably therefore, the counselors' decisions regarding supervision

---

[8] Strand cites Army Regulation 608-10, arguing that the Camp was subject to various requirements that, if applicable, would have mandated that the Camp supervise "child toilets" and that it supply at least two caregivers with each group of children at all times. However, Army Regulation 608-10 applies to Child Development Centers, which provide child care to younger children and infants. While some of the related regulations were adopted by Youth Programs, the "child toilets" regulations, like many other infant specific regulations, were not expressly applicable to the Camp. *See Mot. to Dismiss and Summary Judgment*, 5 (citing Decl. of F. Jamison ¶ 8).

involved an element of judgment or choice. This satisfies the first part of two-step discretionary function exception framework.

Next, the Court considers whether those choices and judgments were "based on considerations of public policy," and thus were "of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 537. The Court finds that they were.

The counselors' judgment regarding supervision of the locker room was precisely the type of discretion that the exception was designed to shield and was based on considerations of policy. As stated in the Youth Program Handbook, the Camp was seeking to promote the policies of leadership and independence on the part of the campers. The counselors' decisions about how closely to monitor campers implicated these goals. Furthermore, there were obviously budgetary, safety, and privacy concerns associated with the extent to which the campers should be supervised, whether at Fort Meade, the pool, or in the locker room. *C.f. United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 819–20 (1984) ("When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind.").

Each of the counselors' supervision-related choices reflected a balancing of these various policy considerations. The decision to station Wade outside of, but not necessarily within, both the girls' and boys' locker rooms reflected an active choice to recognize the campers' need for privacy and opportunities to develop their independence. Those considerations could fairly have been weighed against considerations of safety and health. *C.f. Chrisley v. United States*, 620 F. Supp. 285, 289 (D.S.C. 1985), *aff'd*, 791 F.2d 165 (4th Cir. 1986) ("[T]he authority delegated to and utilized by the [employee] which caused him to weigh often competing interests and to make a decision according to his best judgment would be a discretionary function which would not be

subject to review by this court."). *See also Waverley View Inv'rs, LLC v. United States*, 79 F.

Supp. 3d 563, 577 (D. Md. 2015) (highlighting the Army's need to balance varying competing

interests).

Privacy concerns involving the children are especially significant, given the

embarrassment that could result from having an adult in the locker room of children while they

showered and changed out of bathing suits. In fact, Strand's own expert testified on deposition

that there are serious privacy concerns associated with supervising children in bathrooms. *See*

*Mot. to Dismiss*, Exhibit M, ECF No. 46-15 (Dep. of J. Whichard), 24. The expert even testified

that to avert such concerns, the Camp could have stationed multiple staff members in the locker

room. *Id.* But implementing this recommendation at the pool would have required stationing two

adults inside the boys' locker room and two adults inside the girls' locker room, leaving fewer

adults to supervise those campers who remained outside of the locker rooms. Deciding whether

to place adults inside the locker rooms remained a discretionary decision made by the counselors

in light of their prioritization of the various policy considerations, the specific circumstances

before them, and their understanding of where supervision would best ensure the safety of the

campers. "Judicial intervention in such decisionmaking through private tort suits would require

the courts to 'second-guess' the political, social, and economic judgments of an agency

exercising its regulatory function. It was precisely this sort of judicial intervention in

policymaking that the discretionary function exception was designed to prevent." *Varig Airlines*,

467 U.S. at 820.

It is true that the discretionary function does not apply to preclude liability with respect to

all instances of negligence involving federal employees, such as those in which actors abandon

their duties out of "laziness," "haste," or "carelessness." *C.f. Keller v. United States*, 771 F.3d

1021, 1024 (7th Cir. 2014). *See Coulthurst v. United States*, 214 F.3d 106, 109-110 (2d Cir. 2000). However, the supervisory decisions made in the present case reflect none of these characteristics. Rather, they reflect an attempt to accomplish varying policy goals of the Camp, and thus "[fell] within the overarching policies of a regulatory scheme that [gave counselors] discretion in how to implement that policy." *Wood*, 845 F.3d at *18.

When the counselors decided to place Wade, a female counselor, outside both the boys' and girls' locker rooms, they were exercising precisely the sort of discretion afforded to them in order to ensure that they could accommodate the objectives of each situation. To repeat, choosing how to best supervise the campers in their care was discretionary. *C.f. Carlyle v. U.S., Dep't of the Army*, 674 F.2d 554, 557 (6th Cir. 1982) ("[T]he district court had no jurisdiction over any claim that the Army's decision to house the recruits in the Hotel without supervision created an unreasonable risk and was tortious.").[9]   The discretionary function exception continues to block Strand from asserting a negligence claim based upon the Government's duty to supervise the campers.

## 2. **Wade's Voluntary Undertaking**

Strand's second theory of liability flows from the notion that the Government gratuitously undertook to provide supervision outside of the boys' locker room. The Voluntary Undertaking Doctrine (a.k.a. Gratuitous Undertaking Doctrine or Good Samaritan Rule) states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such

---

[9] The Court also recognizes the overwhelming consistency with which courts have found that the discretionary function exception bars FTCA claims that federal officials negligently failed to protect prison inmates from assault by other inmates. *See McGhee v. United States*, 2011 WL 474413, at *5 (E.D.N.C. Feb. 4, 2011) (collecting cases).

harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement Second of Torts § 323 (1965). According to Strand, by placing Wade outside the boys' locker room, the Government voluntarily undertook supervision as a service to JT and the other boys in the locker room. Therefore, she submits, the Government should be held liable for the decisions Wade made once she heard signs of an argument in the boys' locker room.

According to Wade, she heard the sound of body movements and yelled into the boys' locker room in an attempt to get the boys to hurry up. When she heard the noise continue, she walked to the doorway of the boys' locker room—planning to go inside in order to see what was going on and stop whatever conflict was happening—but, upon hearing that a shower was still running, she decided she could not enter the boys' locker room because a boy might be indecent. This is the point at which Wade and the Government supposedly breached their duty. Strand alleges that Wade's decision to monitor the boys' locker room, to yell inside, and to begin to enter, but then out of considerations of prudishness decide not to enter, constituted a voluntary undertaking which she negligently compounded when she decided to walk—not hasten—to get a male counselor, so he could enter.

Even so, the voluntary undertaking theory of liability still depends on the FTCA's limited waiver of sovereign immunity. Courts have consistently held that application of the voluntary undertaking doctrine does not prevent the application of the discretionary function exception. *See Merklin v. United States*, 788 F.2d 172, 174 (3d Cir. 1986) ("The district court determined that this [good samaritan] theory was barred by the discretionary function exception. We agree."); *Barnson v. United States*, 816 F.2d 549, 554 (10th Cir. 1987) ("The district court also correctly ruled that the discretionary function exception applies to appellants' 'good samaritan' claim."). The discretionary function exception applies equally to the Government's highest-level

supervision decisions as well as the specific acts of supervision conducted by its employees. *See Wood v. United States*, 845 F.3d 123, *11-12 (4th Cir. 2017). *See also United States v. Gaubert*, 499 U.S. 315, 325 (1991). Therefore, it remains entirely plausible that the discretionary function could immunize the Government from liability for the in-the-moment decisions that Wade made, once she heard the commotion in the locker room.

Strand identifies multiple cases in which courts have applied the voluntary undertaking doctrine to defeat the discretionary function exception. *See, e.g.*, *Chang-Williams v. Dep't of the Navy*, 766 F. Supp. 2d 604, 618 (D. Md. 2011). According to Strand, even if the Government's initial decision to assume a duty may have been discretionary, its subsequent negligent performance or dereliction in respect of that voluntary undertaken duty was not. Still, in considering the effect of the voluntary undertaking doctrine on the discretionary function exception, the Court must recur to the two-step discretionary function exception framework discussed previously.

The Court's analysis of the first element remains unchanged. Strand has identified no rule, statute, or policy that would have required Wade to enter the locker room when she heard sounds of an argument. The Youth Program Handbook did not mandate how staff members should react in emergency situations, and no other applicable regulation discussed supervision of middle school students.[10] Thus, Wade's decision to walk to get another counselor rather than enter the locker room, unfortunate as it may seem when viewed with 20-20 hindsight, nevertheless involved an element of judgment, which satisfies the first part of the discretionary function exception calculus.

---

[10] While Wade mentions an informal policy to come to the aid of campers in emergencies, Strand does not identify a formal statement of such a policy.

The second element of the discretionary function exception calculus requires consideration of issues not discussed under Strand's first basis of liability. She alleges that Wade's failure to enter the locker room or otherwise prevent the injury to JT "did not involve any permissible exercise of policy judgment" and was not justified by any "apparent social, economic, or political considerations." She highlights a number of cases in which courts have concluded that the Government's negligent performance or dereliction of a voluntarily undertaken duty was not "based on considerations of public policy." In these cases, the discretionary function exception was not applied in favor of the governmental entity, suggesting the possibility of liability under the FTCA here.

Strand's cases, however, fail to persuade.

One of the cases she cites is *Chang-Williams v. Dep't of the Navy*, 766 F. Supp. 2d 604, 617 (D. Md. 2011). On November 1, 2002, U.S. Marine Corps Sergeant Estabon Eugene was arrested and charged with assault in the second degree as well as refusal to follow lawful police order after police found him at the home of his estranged wife, Nakeisha Rhea. *Chang-Williams*, 766 F. Supp. 2d at 608. Eugene was released on bail the next day when a Marine Corps Sergeant acted as his indemnitor and paid the $510 bail bondsman's fee. *Id.* According to the complaint, a Marine Corps Captain and Gunnery Sergeant visited Rhea and her family on November 4, 2002 and "assured the family that they would protect 'all of [them].'" *Id.* at 610. In particular, the visitors allegedly told the family that Eugene would be confined to the base and would not be free to leave the base without an escort. *Id.* On November 5, 2002, Marine Corps command issued a "Military Protection Order," instructing Eugene to stay at least 100 feet away from Rhea, her residence, or her work place, and barred him from having any unauthorized contact with her. *Id.* at 609. Despite this, on November 12, 2002, Eugene attacked Rhea's family

members, killing Chang-Williams' husband and son, and shooting her in the face. *Id.* at 608. Chang-Williams filed suit pursuant to the FTCA, alleging negligent failure to protect, negligent supervision, and *respondeat superior* liability on the part of the Government. *Id.* at 610-11.

The Government based its defense, in part, on the discretionary function exception, arguing that the determination of whether to detain and supervise Eugene was left to the discretion of his commanding officers. *Id.* at 616. The court stated, however, that "while the initial decision to assume a duty may be discretionary, that decision is not what Chang-Williams challenge[d]." *Id.* at 618. Rather, Chang-Williams was understood to have challenged the Government's actions taken *after* the Marine Corps allegedly promised to protect the family. *Id.* Thus, she "contend[ed] that the Government injured her because its agents negligently breached their initial promise and allowed Eugene to roam free." *Id.* The court categorized this as "a claim based on the dereliction (rather than assumption) of a promise to protect." *Id.* The court then proceeded to analyze "whether the agents of the United States performed a discretionary function when they disregarded their own specific assurances to Chang-Williams and her family." *Id.*

The court answered that question in the negative, concluding that if the facts were as Chang-Williams alleged, the discretionary function exception would not apply. *Id.* at 619. It noted that "case law has coalesced around a simple notion: 'once federal government officials affirmatively decide to undertake to carry out a duty, the discretionary function exception of section 2680(a) may not be applicable if those officials perform that duty negligently, even though their decision whether or not initially to undertake that duty was itself discretionary.'" *Id.* at 618. In analyzing the second element of the two-step framework, the court held, "it is hard to see how the actions of the United States would involve 'judgment' or 'choice' if it assumed a duty to take certain particular actions and wholly failed to do so. . . . For a choice to be truly

discretionary there must be some necessary consideration of two or more real alternatives that fundamentally relate to policy choices. There must be 'room for choice.' There is no apparent room here." *Id.* at 619.

The *Chang-Williams* court quoted the Supreme Court's holding in *Indian Towing Co. v. United States*, 350 U.S. 61 (1951): "once [an agency] exercised its discretion . . . and engendered reliance . . . , it was obligated to use due care [in the exercise of that discretion]." In *Indian Towing*, a barge company sued the United States for damages after the company's vessel ran aground. The company alleged that the Coast Guard was negligent when it built a lighthouse but failed to ensure that it was operating as intended. *Id.* at 66. The Supreme Court found that, even though the Coast Guard was under no obligation to construct a lighthouse:

> [O]nce it exercised its discretion to operate a [lighthouse] and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

Id. at 69.[11]

These decisions definitely give pause in the present case, if only to suggest that this case is a "hard" one. However, the fact remains that Wade's decision to refrain from entering the boys' locker room and walk to get a male counselor may be distinguished from the Government's actions in *Chang-Williams* and *Indian Towing*. Wade's actions involved her judgment as to how to best supervise the campers and reflected the same policy considerations

---

[11] Strand concedes that the Government did not claim protection of the discretionary function exception in *Indian Towing*. However, the Supreme Court later held that its holding in *Indian Towing* "illuminate[d] the appropriate scope of the discretionary function exception" by explaining that while "the initial decision to undertake and maintain lighthouse service was a discretionary judgment," failure to maintain the lighthouse "did not involve any permissible exercise of policy judgment." *Berkovitz v. United States*, 486 U.S. 531, 538 n.3 (1988).

that underlay all of the Camp's decisions regarding supervision of the campers (i.e., respecting their independence, privacy, as well as their security). On hearing sounds of an argument in the boys' locker room, Wade made a series of quick decisions, each of which required her to consider, balance, and prioritize varying policy goals. When she began to enter the boys' locker room and heard the shower running, she instinctively balanced the need to protect the campers' safety and independence against the need to safeguard their privacy. When she walked to get a male counselor, she continued to prioritize one stated Camp policy—privacy—over another stated Camp policy—safety. The split-second decisions Wade made in those moments were precisely of the type the Court would expect to be grounded in considerations of policy.[12]

In contrast, in *Chang-Williams*, the court held that "there [were] no apparent 'social, economic, [or] political' considerations that [c]ould underlie the United States' decision to ignore its own promise" to protect the family from Eugene. *Chang-Williams*, 766 F. Supp. at 619 ("For a choice to be truly discretionary there must be some necessary consideration of two or more real alternatives that fundamentally relate to policy choices."). Unlike the Navy's total breach of its promise to protect the family in *Chang-Williams* or the Coast Guard's decision to allow a lighthouse to go completely unrepaired in *Indian Towing*, Wade's choices reflected alternative policy concerns. There were, as the courts involved recognized, no meaningful competing choices accounting for the failure of the Government to act in *Chang-Williams* and *Indian Towing*. *C.f. Barnson v. United States*, 816 F.2d 549, 554 (10th Cir. 1987) (holding that the discretionary function exception applies to plaintiff's good samaritan claim because the

---

[12] As the court in *Chang-Williams* recognized, "[d]etermining whether the discretionary function exception applies is not a fact-intensive exercise." *Chang-Williams* 766 F. Supp. 2d at 617. Rather, "the court will only 'look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy.'" *Id*. (quoting *Baum v. United States*, 986 F.2d 716, 721 (4th Cir.1993)).

record reflects that the decision not to advise the miners of the health risks was based on political policy rather than on medical considerations").

The Court does take notice of the fact that a private summer camp might well be held liable in a situation parallel to the present case. Nevertheless, the Court is faced with an extensive body of case law outlining the clear two-part test for discretionary function exception analysis in claims against the Federal Government which, even when applied *vis a vis* the voluntary undertaking doctrine, still leads to the conclusion that the exception applies here. *See Barnson v. United States*, 630 F. Supp. 418, 421 (D. Utah 1985), *aff'd*, 816 F.2d 549 (10th Cir. 1987); *Merklin v. United States*, 788 F.2d 172, 174 (3d Cir. 1986).

The discretionary function exception requires courts to draw lines, dividing those cases involving negligent choices guided by policy from those involving negligent decisions so far removed from the policies underlying them that the discretionary function exception should not apply. When drawing the line between actionable and nonactionable negligence, courts are obliged to consider that, without the discretionary function exception, the Government could face potential tort liability for most if not all the decisions it makes. *See Wood*, 845 F.3d 123 at *19 ("Were we to hold, for example, that Wood could challenge the Navy's decision not to place a warning sign near the mock-ship, it would open the Navy to tort liability for <u>every</u> similar decision made when allowing civilian law enforcement agencies to use its facilities. The threat of tort liability would become a tool to shape Navy policy, which is exactly what the discretionary function exception seeks to avoid."). In drawing this line today, the Court holds that where a Government employee perceives that a course of action is appropriate, and arguably rejects that course of action, and as a result of that decision harm is inflicted on a person under the

Government employee's supervision, the discretionary function exception applies so long as that decision was plausibly made based on competing policy considerations.

Here, the Court is convinced that each of the supervisory decisions made at the Camp that Strand assails were guided by competing policy considerations. The discretionary function exception applies and stands as a bar to her suit against the Government.

### III. CONCLUSION

For the foregoing reasons, the Government's Motion for Partial Dismissal for Lack of Subject Matter Jurisdiction will be **GRANTED**, as set forth in the accompanying Order.


_____/s/_____

**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**February 7, 2017**